# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LULA G. LUCAS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00064 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Lula G. Lucas, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

-1-

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lucas protectively filed her applications for DIB and SSI on September 1, 2005, alleging disability as of June 20, 2005, based on nervousness and an inability to deal with large crowds and the public. (Record, ("R."), at 15, 39-41, 44, 105, 217-19.) The claims were denied initially and upon reconsideration. (R. at 31-34, 221-26, 228-30.) Lucas then requested a hearing before an administrative law judge, ("ALJ"). (R. at 35.) The ALJ held a hearing on February 16, 2007, at which Lucas was represented by counsel. (R. at 256-84.)

By decision dated March 23, 2007, the ALJ denied Lucas's claims. (R. at 15-23.) The ALJ found that Lucas met the disability insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 17.) The ALJ found that Lucas had not engaged in substantial gainful activity since June 20, 2005. (R. at 17.) The ALJ also found that the medical evidence established that Lucas suffered from severe impairments, namely major depressive disorder, panic disorder without agoraphobia and a generalized anxiety disorder, but the ALJ found that Lucas did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.) The ALJ found that Lucas's medically determinable impairments reasonably could be expected to produce the alleged symptoms, but Lucas's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. at 20.) The

-2-

ALJ also found that Lucas had the residual functional capacity to perform work at all levels of exertion. (R. at 19.) However, the ALJ found that Lucas would be limited to simple, unskilled work and should avoid frequent contact with the public. (R. at 19.) The ALJ also found that Lucas had no functional limitations with activities of daily living, mild to moderate functional limitations in maintaining social functioning and moderate functional limitations in maintaining concentration, persistence and pace. (R. at 19.) Thus, the ALJ concluded that Lucas could not perform any of her past relevant work. (R. at 21.) Based on Lucas's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including those of a food preparer, a cleaner, a machine operator, an administrative assistant, a nonpostal mail clerk, a sorter and a packager. (R. at 21-22.) Therefore, the ALJ concluded that Lucas was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Lucas pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 5-8.) Lucas then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). The case is before this court on Lucas's motion for summary judgment filed April 21, 2008, and the Commissioner's motion for summary judgment filed June 18, 2008.

Lucas was born in 1964, (R. at 39, 217, 259), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). She has a high school education with three semesters of college-level instruction. (R. at 110, 259.) Lucas has past relevant work as a bindery worker, a cashier, a customer service representative, a hostess, a nurse's aide and a nurse's assistant. (R. at 106-07.)

Lucas testified that she was previously employed as a nurse's assistant and as a nurse's aide, but she stated that she was not a certified nurse's assistant.[2] (R. at 259-60.) She testified that she last worked as a nurse's aide for an in-home care company. (R. at 260.) She stated that her duties included general housekeeping, preparing meals and bathing patients. (R. at 260.) Lucas stated that she performed this job for approximately seven months, but she quit working after experiencing a panic attack at a patient's home. (R. at 260-61.) She testified that she was being treated for panic attacks at that time, but did not have her medication with her because her employer did not permit possession of medication. (R. at 261-62.) Lucas stated that she began seeing a counselor after the June 2005 panic attack. (R. at 263.) Lucas testified that she took Xanax and Lexapro for anxiety disorder and depression. (R. at 264.) However, she stated that the medication caused side effects, including poor concentration and poor memory. (R. at 272.) Lucas also testified that her medication made her very sleepy and caused her to black out. (R. at 269.) She stated that she

---

[1]Lucas challenges only the ALJ's findings regarding her mental impairments. Therefore, the facts contained herein will focus on only Lucas's alleged mental impairments and resulting limitations.

[2]The ALJ's decision erroneously indicates that Lucas testified that she had obtained a nursing assistant certificate. (R. at 17.)

-4-

continued to experience panic attacks after quitting her job and that the attacks varied in intensity. (R. at 269.) She described a major panic attack to include crying without reason, vomiting, poor appetite and the desire to be left alone. (R. at 269.) Lucas testified that she had not experienced a severe panic attack for approximately five or six months. (R. at 269.) She stated that she had experienced mild panic attacks since that time, which she could "walk off." (R. at 269.) She described these panic attacks to include headaches, muscle tightening and nausea. (R. at 270.) Lucas testified that she experienced these milder panic attacks four to five times weekly, lasting for up to one hour. (R. at 270.) She stated that she also suffered from depression, causing her to want to isolate herself at home. (R. at 271.) However, Lucas stated that she drove by herself to a nearby convenience store weekly. (R. at 271.) She testified that her mother usually accompanied her to the grocery store and to the doctor's office. (R. at 271-72.) Lucas testified that she experienced crying spells at least once daily. (R. at 273.)

Lucas testified that she also had worked as a machine operator in a clothing factory, a customer service representative at an insurance company and a cashier at convenience and grocery stores. (R. at 265-66.) She testified that the jobs were stressful and involved frequent contact with the public. (R. at 265-66.) Lucas testified that the job as a customer service representative required concentration. (R. at 266.) She stated that she could not return to any of these jobs due to her inability to concentrate and deal with the public. (R. at 266-67.) She stated that she experienced blackouts, causing her to forget the task that she was performing. (R. at 267.) She stated that it was difficult for her to read a book, as she constantly needed to go back and re-read portions. (R. at 268.) She stated that she had relinquished the

responsibility of maintaining the family checkbook a year previously because she would forget to record the transactions that she made. (R. at 267-68.)

Cathy Sanders, a vocational expert, also was present and testified at Lucas's hearing. (R. at 276-83.) Sanders classified Lucas's past relevant work as a convenience store cashier as light[3] and semiskilled, her work as a grocery cashier as medium[4] and semiskilled, her work as a nurse's assistant as heavy[5] and unskilled, her work as a sewing machine operator as light and semiskilled and her work as a customer service representative as sedentary[6] and semiskilled. (R. at 277.) Sanders was asked to consider a hypothetical individual of Lucas's age, education and work history, who could perform simple work requiring very little concentration, who had mild difficulties with social interaction and various normal activities and who must avoid frequent contact with the public. (R. at 278.) Sanders testified that such an

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, she also can perform sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

[6]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2008).

-6-

individual could perform jobs existing in significant numbers in the national economy, including those of a nonconstruction laborer, a food preparer, a machine operator, a cleaner, an administrative assistant, a stocker, a hand packager, a nonpostal mail clerk and a sorter, all at both the light and medium levels of exertion. (R. at 278.) Sanders also testified that individuals in those occupations would be allowed to miss no more than two days of work monthly. (R. at 279.) Sanders further testified that an individual who could not leave her home, could not work. (R. at 280.) Sanders was next asked to consider an individual with the limitations set forth in state agency psychologist Tenison's assessment. (R. at 280.) Sanders testified that the number of jobs previously mentioned would be reduced by 30 percent.[7] (R. at 280.) When asked to consider the limitations set forth in the mental assessment completed by psychologists Abbott and Lanthorn, Sanders testified that the previous hypotheticals encompassed such limitations. (R. at 282-83.)

In rendering his decision, the ALJ reviewed records from Dr. Sheldon H. Fisher, D.O.; Dr. Todd A. Cassel, M.D.; Dr. Sean P. White, M.D.; Donna Abbott, M.A., a licensed senior psychological examiner; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; R.J. Milan Jr., Ph.D., a state agency psychologist; Clinch River Health Services; and Karen Odle,

---

[7]There still would remain a significant number of jobs given this 30 percent reduction. The vocational expert initially testified to the existence of 4,150 jobs in the region and 775,000 jobs in the nation at the medium level of exertion. (R. at 279.) Thus, a 30 percent reduction would leave 2,905 jobs in the region and 542,500 jobs in the nation. The vocational expert initially testified to the existence of 11,500 jobs in the region and 2.75 million jobs in the nation at the light level of exertion. (R. at 279.) Thus, a 30 percent reduction would leave 8,050 jobs in the region and 1,925,000 jobs in the nation. The United States Court of Appeals for the Fourth Circuit held in *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), that 110 jobs would not constitute an insignificant number.

-7-

L.P.C. Lucas's attorney submitted additional medical records from Clinch River Health Services and Dr. Cassel to the Appeals Council.[8]

On May 5, 2005, Lucas saw Dr. Todd A. Cassel, M.D., with various complaints, including trouble with her "nerves." (R. at 179.) She noted that she was taking care of an elderly patient who was very demanding and who cursed at her. (R. at 178.) Lucas's affect was deemed mildly agitated and a little irritated. (R. at 178.) Dr. Cassel diagnosed exacerbation of anxiety, irritation and situational depression. (R. at 178.) Lucas was continued on Xanax and was advised to exercise and get fresh air. (R. at 178.) On June 23, 2005, Dr. Cassel noted that Lucas's mood was "ok" on Prozac. (R. at 177.) However, he noted that she had to quit her job due to severe anxiety because of her demanding patient. (R. at 177.) Lucas stated that she felt better since quitting and that she was looking for a job. (R. at 177.) Dr. Cassel diagnosed anxiety and continued Lucas on Prozac and Xanax. (R. at 177.)

On November 14, 2005, Donna Abbott, M.D., a licensed senior psychological examiner, and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Lucas at the request of the Virginia Department of Rehabilitative Services. (R. at 148-53.) Lucas reported that she had been seeing a counselor at Clinch River for more than a year. (R. at 149.) The examiners noted that Lucas was fully oriented, and her effort was deemed adequate. (R. at 150.) Her memory and processes were intact, and she was able to attend and concentrate to

---

[8]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

complete tasks. (R. at 150.) Abbott and Lanthorn noted that Lucas's mood was more anxious than depressed. (R. at 150.) There was no evidence of disordered thought processes or delusional thinking, and Lucas appeared to be rational and alert. (R. at 150.) Lucas stated that she began experiencing panic attacks approximately three to four years previously and that she was then-currently experiencing one or two each month. (R. at 150.) She stated that medication helped with these attacks. (R. at 150.) Lucas stated that when she had a panic attack, she would become hot and sweaty and would sometimes vomit and black out. (R. at 150-51.) Although Lucas reported some depression, she noted that this had improved some. (R. at 151.) She described poor sleep and low energy. (R. at 151.) Lucas stated that her depression worsened when she separated from her husband, but that it had improved once she began adjusting to the divorce. (R. at 151.) She stated that she did not like going to the grocery store and she did not have a checking account, but she stated that she did manage her bills. (R. at 151.) She stated that she visited her mother and sometimes her neighbor. (R. at 151.) Lucas reported that she enjoyed listening to music. (R. at 151.) She stated that she did not enjoy having company, as she feared that she would have a panic attack in front of people. (R. at 151.) She reported having "bad days," during which she would not leave the house. (R. at 151.) Although Lucas stated that she could drive, she stated that she did not like to go anywhere by herself for fear that she would have a panic attack. (R. at 151.)

Abbott and Lanthorn opined that Lucas should be able to relate adequately to others. (R. at 151.) They further opined that she could manage her own resources. (R. at 151.) Their notes reveal that psychological testing was not requested. (R. at 151.) Abbott and Lanthorn diagnosed Lucas with a panic disorder without agoraphobia,

major depressive disorder, single episode, in partial remission, generalized anxiety disorder, ongoing panic attacks and associated generalized anxiety and a then-current Global Assessment of Functioning, ("GAF"), score of 55.[9] (R. at 152.) They opined that Lucas could understand and remember and that her estimated intellectual functioning was in the average range. (R. at 152.) They further opined that Lucas could attend and concentrate, at least for short periods of time, but that her ability to maintain attention and concentration was affected by panic attacks. (R. at 152.) They noted her fear of having a panic attack in front of others. (R. at 152.) Abbott and Lanthorn opined that Lucas was moderately limited in her adaptation skills and that she might have some difficulty working in proximity to others due to the panic attacks. (R. at 152.) They noted that stress likely exacerbated her anxiety. (R. at 152.) Abbott and Lanthorn recommended that Lucas be involved in psychiatric treatment and counseling. (R. at 152.) They opined that with appropriate treatment, some continued improvement in Lucas's functioning could be anticipated. (R. at 152.)

On December 9, 2005, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Lucas suffered from an affective disorder and an anxiety-related disorder, and that a residual functional capacity assessment was necessary. (R. at 154-68.) Tenison found that Lucas was not restricted in her activities of daily living, experienced only mild difficulties in maintaining social functioning, experienced moderate difficulties in

---

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32.

maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 164.) Tenison found Lucas's subjective allegations to be partially credible. (R. at 167.) These findings were affirmed by R.J. Milan Jr., Ph.D., another state agency psychologist, on June 22, 2006. (R. at 154.)

Also on December 9, 2005, Tenison completed a mental residual functional capacity assessment, indicating that Lucas was moderately limited in her abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting and to travel in unfamiliar places or use public transportation. (R. at 170-73.) In all other areas of mental functioning, Lucas was deemed not significantly limited. (R. at 170-71.) These findings were affirmed by state agency psychologist Milan on June 22, 2006. (R. at 172.)

On July 13, 2006, Dr. Cassel noted increasing depression and anxiety. (R. at 209.) Lucas informed Dr. Cassel that her ex-husband was keeping a "check on her" and criticizing her. (R. at 209.) Dr. Cassel noted that she was taking Xanax regularly, which he advised her to continue, and he increased her dosage of Prozac. (R. at 209.)

-11-

Dr. Cassel further advised Lucas to discuss these issues with her counselor. (R. at 209.) Lucas saw Karen Odle, L.P.C., on July 28, 2006, for a psychiatric diagnostic interview. (R. at 215.) Odle diagnosed Lucas with recurrent major depression, mild, and a panic disorder without agoraphobia. (R. at 215.) She assessed Lucas's then-current GAF score at 51. (R. at 215.) Odle recommended that Lucas continue her medication regimen as prescribed by her treating physician, and she recommended counseling once to twice each month. (R. at 215.) This is the only note from Odle contained in the record. On August 10, 2006, Lucas reported that the increased dosage of Prozac allowed her to better express her feelings. (R. at 206.) However, she further noted that it precipitated some anxiety, for which she had to take more Xanax. (R. at 206.) Dr. Cassel diagnosed some difficult situational stressors, and he continued Lucas's medications. (R. at 206.) On August 17, 2006, Dr. Cassel decided to taper Lucas off of Prozac and start Lexapro. (R. at 206.) On August 27, 2006, Lucas informed Dr. Cassel that she was no longer taking Prozac and was on the Lexapro. (R. at 207.) However, she stated that she was shaking, nervous and nauseated. (R. at 207.) She was prescribed Hydroxyzine. (R. at 207.) On September 14, 2006, Lucas requested samples of Lexapro. (R. at 207.) On December 5, 2006, Dr. Cassel noted that Lucas's mood was "okay," but that she still did not want to go out much. (R. at 204, 237.) Her affect was stable. (R. at 204, 237.) Dr. Cassel diagnosed depression, stable though not completely responded, and he increased her dosage of Lexapro. (R. at 204, 237.) On February 5, 2007, Dr. Cassel noted that Lucas had done "much better" after the increase in Lexapro. (R. at 237.) He diagnosed depression, improved, along with improving anxiety. (R. at 237.) Dr. Cassel noted that Lucas had found a healthy way of dealing with and working through things. (R. at 237.) On May 7, 2007, Dr. Cassel noted that Lucas's mood was "ok." (R. at 232, 254.) He

-12-

diagnosed her with depression. (R. at 232, 255.) Although Lucas saw Dr. Cassel on May 23, 2007, July 9, 2007, and July 13, 2007, she made no complaints of anxiety or depression. (R. at 249-53.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*,

-13-

658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4ᵗʰ Cir. 1980).

By decision dated March 23, 2007, the ALJ denied Lucas's claims. (R. at 15-23.) The ALJ found that the medical evidence established that Lucas suffered from severe impairments, namely major depressive disorder, panic disorder without agoraphobia and a generalized anxiety disorder, but the ALJ found that Lucas did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.) The ALJ found that Lucas's medically determinable impairments reasonably could be expected to produce the alleged symptoms, but Lucas's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. at 20.) The ALJ also found that Lucas had the residual functional capacity to perform work at all levels of exertion. (R. at 19.) However, the ALJ found that Lucas would be limited to simple, unskilled work and should avoid frequent contact with the public. (R. at 19.) The ALJ also found that Lucas had no functional limitations with activities of daily living, mild to moderate functional limitations in maintaining social functioning and moderate functional limitations in maintaining concentration, persistence and pace. (R. at 19.) Thus, the ALJ concluded that Lucas could not perform any of her past relevant work. (R. at 21.) Based on Lucas's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including those of a food preparer, a cleaner, a machine operator, an administrative assistant, a nonpostal mail clerk, a sorter and a packager. (R. at 21-22.) Therefore, the ALJ concluded that Lucas was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g),

-14-

416.920(g).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Lucas argues that the ALJ erred in evaluating the severity of her mental impairments and their effect on her ability to work. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-7.)

-15-

Based on my review of the evidence, I find that substantial evidence supports the ALJ's findings regarding Lucas's mental impairments and their accompanying work-related mental limitations. The ALJ concluded that Lucas suffered from major depressive disorder, panic disorder without agoraphobia and generalized anxiety disorder, all of which he deemed were severe impairments. (R. at 17-19.) The ALJ further found that Lucas was limited to the performance of simple, unskilled work, that she needed to avoid frequent contact with the public, that she had mild to moderate limitations in maintaining social functioning and that she had moderate limitations in maintaining concentration, persistence or pace. (R. at 19.) I find that substantial evidence supports such a finding.

Specifically, the vocational expert testified that an individual of Lucas's age, education, work history and residual functional capacity, as found by the ALJ, could perform jobs existing in significant numbers in the national economy. (R. at 277-79.) A vocational expert's testimony constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The ALJ may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309 (4th Cir. 1979). The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) is the ALJ's finding as to the claimant's residual functional capacity supported by substantial evidence; and 2) does the hypothetical adequately set forth the residual functional capacity as found by the ALJ? For the following reasons, I find that substantial evidence supports the ALJ's residual

functional capacity finding.

The ALJ's residual functional capacity finding is supported by Lucas's activities of daily living, as well as the assessments of both the treating and nonexamining mental health sources contained in the record. For instance, in a Function Report dated April 26, 2006, Lucas stated that she prepared light meals daily, performed light housework and some light yard work. (R. at 75.) She stated that her mother had to remind her to take her medications, that the only place she drove was her mother's house and that her mother's house was the only place she could go alone. (R. at 75-76.) She stated that she shopped once monthly, but that she had to be accompanied by someone. (R. at 76.) Lucas stated that she was able to pay bills, count change, handle a savings account and use a checkbook and money orders. (R. at 76.) She stated that she listened to music daily and that she visited her mother daily. (R. at 77.) She stated that she had difficulty concentrating, following written and verbal instructions, getting along with others and being around others, handling stress and handling changes in routine. (R. at 78-79.) Lucas stated that on an "ordinary day," she cooked, cleaned her house, washed laundry and tended to her garden. (R. at 119.) She stated that she had taken an out-of-state trip with a friend at some time over the previous year. (R. at 119.) At her hearing in February 2007, Lucas testified that she isolated herself at home. (R. at 271.) She stated that she drove by herself to a nearby convenience store weekly, but that her mother usually accompanied her to the grocery store and to the doctor's office. (R. at 271.) Lucas testified that she had difficulty concentrating and dealing with the public. (R. at 266-67.)

Contrary to Lucas's contention, I find that the ALJ's residual functional capacity finding is supported by the assessment completed by Abbott and Lanthorn, who opined that Lucas should be able to relate adequately to others, that she could understand and remember and that she was of average intelligence. (R. at 151-52.) They further opined that Lucas could concentrate for short periods of time, that she was moderately limited in her ability to adapt and that she might have some difficulty working in proximity to others. (R. at 152.) Likewise, state agency psychologists Tenison and Milan opined that Lucas was not restricted in her activities of daily living, experienced only mild difficulties in maintaining social functioning and experienced moderate difficulties in maintaining concentration, persistence or pace. (R. at 164.) Tenison and Milan opined that Lucas was moderately limited in her abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting and to travel in unfamiliar places or use public transportation. (R. at 170-73.) In all other areas of mental functioning, Lucas was deemed not significantly limited. (R. at 170-71.)

Finally, the ALJ's residual functional capacity finding is supported by Dr. Cassel's treatment notes. In particular, these notes indicate that Lucas's mental difficulties stemmed from situational stressors, including the deaths of her father and brother and her separation and eventual divorce from her husband. (R. at 151, 204.) Dr. Cassel's notes further indicate that Lucas quit her job as a nurse's aide in June 2005 due to anxiety over a very demanding patient who cursed at her, and that she was looking for another job. (R. at 177.) Dr. Cassel did not discourage her from looking for other work. He treated Lucas's anxiety and depression with medication, and he advised her to exercise and get fresh air. (R. at 178.) Lucas stated that medications improved her condition, and this improvement is reflected in various treatment notes contained in the record. (R. at 150-51, 177, 206, 237.) On June 23, 2005, Lucas's mood was "ok," (R. at 177), and in November 2005, Lucas stated that her depression had improved some. (R. at 151.) On July 13, 2006, Lucas reported increased depression and anxiety, but it appears that this was due to some difficulties that she was experiencing with her ex-husband. (R. at 209.) The following month, Lucas advised Dr. Cassel that an increased dosage of Prozac allowed her to better express her feelings. (R. at 206.) By December 2006, Lucas's mood was again described as "okay," and her affect was stable. (R. at 204, 237.) In February 2007, Lucas was doing "much better" on an increased dosage of Lexapro, and Dr. Cassel diagnosed depression, improved. (R. at 237.) Dr. Cassel also noted that Lucas's anxiety was improving along with her depression. (R. at 237.) Finally, in May 2007, Lucas's mood continued to be "ok." (R. at 232, 254.) The court notes that Dr. Cassel placed no restrictions on Lucas's work-related mental abilities during the time period relevant to this court's decision. While Lucas correctly notes in her brief that Dr. Cassel found that her panic attacks were debilitating and, for some time, prevented employment and

interfered with activities of daily living, Dr. Cassel made this statement in July 2003, nearly two years prior to Lucas's alleged onset of disability, and nearly two years before Lucas quit working. (R. at 186.) Dr. Cassel has made no such similar statement relevant to the time period currently before the court. The court further notes that although Lucas stated in a questionnaire dated August 2006 that she quit working in June 2005 upon Dr. Cassel's advice, this contention is wholly unsupported by Dr. Cassel's treatment notes. (R. at 118.) Furthermore, Lucas testified at her hearing that she quit after experiencing a panic attack in a patient's home. (R. at 262.) She further testified that her employer had given her the option to voluntarily resign or to be terminated. (R. at 262.) Finally, there is nothing contained in counselor Odle's treatment note to contradict the ALJ's residual functional capacity finding. Odle diagnosed Lucas with recurrent major depression, mild, and a panic disorder without agoraphobia. (R. at 215.) She assessed Lucas's GAF score as 51, indicating moderate symptoms. (R. at 215.) Odle recommended counseling once or twice monthly, but she placed no restrictions on Lucas's work-related mental abilities. (R. at 215.)

Based on all of the above-stated evidence contained in the record, I find that the ALJ's determination that Lucas had the residual functional capacity to perform simple, unskilled work, that she needed to avoid frequent contact with the public, that she had mild to moderate limitations in maintaining social functioning and that she had moderate limitations in maintaining concentration, persistence or pace is supported by substantial evidence. (R. at 19.) For the reasons that follow, I further find that the hypothetical questions presented to the vocational expert fairly set out all of Lucas's impairments. The vocational expert testified that an individual of Lucas's

-20-

age, education and work history who could perform simple work requiring very little concentration, who had mild difficulties with social interaction and who must avoid frequent contact with the public, could perform jobs existing in significant numbers in the national economy.  (R. at 278.)  Likewise, the vocational expert further testified that an individual with the limitations assessed by state agency psychologists Tenison and Milan could perform a significant number of jobs existing in the national economy.  (R. at 280.)  Finally, when the vocational expert was asked to consider an individual with the limitations assessed by Abbott and Lanthorn, she testified that such limitations were encompassed within the previous hypotheticals.  (R. at 282-83.)  Given the evidence contained in the record before the court set out above, I find that these hypotheticals presented to the vocational expert fairly set out all of Lucas's impairments.  While the vocational expert testified that an individual who would miss more than two days of work monthly, and that an individual who could not leave her home, could not perform the enumerated jobs, there simply is not evidence in the record to substantiate such limitations in this case.  Lucas has been diagnosed with a panic disorder *without* agoraphobia, and while she alleges difficulty leaving the house due to fear of having a panic attack in public, her medications have improved her symptoms, and she testified that the attacks she now experiences are generally milder ones that she is able to work through.  (R. at 269-70.)

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's findings regarding Lucas's mental impairments and their resulting work-related mental limitations.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

2.      Substantial evidence exists in the record to support the ALJ's finding that Lucas is not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Lucas's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's finding that Lucas is not disabled under the Act and is not entitled to benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review.  At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 15th day of August 2008.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-23-